**FILED**
**U.S. DISTRICT COURT**
**EASTERN DISTRICT ARKANSAS**

### THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

JUL 2 9 2024

TAMMY H. DOWNS, CLERK

By: _____ DEP CLERK

| | |
|---|---|
| **JACKSON DUBRAY, JASMINE MACK,** **d/b/a J. MACK ENTERPRISES, WILLIAM** **BRITTON, TRAE SANTIAGO and** **TERRANCE PRUITT, on behalf of** **themselves and all others similarly situated,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **EVOLVE BANK & TRUST,** <br><br> **Defendant.** | Case No.: 4:24-cv-642-JM <br><br> **COMPLAINT-CLASS ACTION** <br><br> **DEMAND FOR JURY TRIAL** <br><br><br> This case assigned to District Judge **Moody** and to Magistrate Judge **Moore** |

Plaintiffs Jackson Dubray, Jasmine Mack d/b/a J. Mack Enterprises, William Britton, Trae

Santiago and Terrance Pruitt (collectively "Plaintiffs") bring this Class Action Complaint against

Evolve Bank & Trust ("Evolve" or "Defendant"), individually and on behalf of all others similarly

situated ("Class Members"), and allege, upon personal knowledge as to their own actions and their

counsels' investigations, and upon information and belief as to all other matters, as follows:

### I. INTRODUCTION

1.      Plaintiffs bring this class action against Defendant for its failure to properly secure

and safeguard personal identifiable information ("PII")[1] of potentially several hundred thousand

individuals and businesses, including, but not limited to, name, date of birth, federal/state

identification numbers, tax identification number, social security number and/or financial account

information, and other information such as phone number, address, and email address.

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

2.      Founded in 1925, Evolve is a banking institution charted in Arkansas which provides personal and commercial banking, and mortgage services, based in West Memphis, Arkansas.

3.      Prior to and through June 26, 2024, Defendant obtained the PII of Plaintiffs and Class Members, including by collecting it directly from Plaintiffs and Class Members.

4.      Prior to and through June 26, 2024, Defendant stored the PII of Plaintiffs and Class Members, unencrypted, in an Internet-accessible environment on Defendant's network.

5.      On or before June 26, 2024, Defendant learned of a data breach on its network that occurred on or around June 23, 2024 (the "Data Breach").

6.      Defendant determined that, during the Data Breach, a ransomware gang accessed and/or acquired the PII of Plaintiffs and Class Members.

7.      On or around June 26, 2024, Defendant began notifying Plaintiffs and Class Members of the Data Breach.

8.      By obtaining, collecting, using, and deriving a benefit from the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion. Defendant admits that the unencrypted PII that was accessed and/or acquired by an unauthorized actor included name, date of birth, driver's license number, federal/state identification card number, tax identification number, social security number and/or financial account information, and other information such as phone number, address, and email address.

9.      The exposed PII of Plaintiffs and Class Members can be sold on the dark web. Hackers can access and then offer for sale the un-encrypted, unredacted PII to criminals. Plaintiffs and Class Members now face a lifetime risk of (i) identity theft, which is heightened here by the

loss of Social Security numbers, and (ii) the sharing and detrimental use of their sensitive information.

10.     The PII was compromised due to Defendant's negligent and/or careless acts and omissions and the failure to protect the PII of Plaintiffs and Class Members. Defendant has also purposefully maintained secret the specific vulnerabilities and root causes of the breach and has not informed Plaintiffs and Class Members of that information.

11.     Prior to receiving notification, Plaintiffs and Class Members had no idea their PII had been compromised, and that they were, and continue to be, at significant risk of identity theft and various other forms of personal, social, and financial harm, including the sharing and detrimental use of their sensitive information. The risk will remain for their respective lifetimes.

12.     Plaintiffs bring this action on behalf of all persons whose PII was compromised as a result of Defendant's failure to: (i) adequately protect the PII of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected PII using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

13.     Plaintiffs and Class Members have suffered injury as a result of Defendant's conduct. These injuries include: (i) lost or diminished value of PII; (ii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (iii) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time, (iv) the disclosure of their private information, and (v) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and

3

abuse; and (b) may remain backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

14.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to take and implement adequate and reasonable measures to ensure that the PII of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required and appropriate protocols, policies and procedures regarding the encryption of data, even for internal use. As a result, the PII of Plaintiffs and Class Members were compromised through disclosure to an unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

15.     On behalf of herself and the Class as defined herein, Plaintiffs bring claims for negligence, breach of fiduciary duty, breach of confidence, breach of express contract, breach of implied contract, and, in the alternative to their contract-based claims, unjust enrichment. The remedies Plaintiffs seek include actual, nominal, and putative damages; appropriate injunctive and declaratory relief; and attorneys' fees, costs, and expenses.

## II. PARTIES

16.     Plaintiff Jackson Dubray is now and has at all relevant times been a resident and citizen of Illinois, currently residing in Chicago, Illinois. Plaintiff Dubray received the letter notifying him of the breach, via email, directly from Defendant dated June 26, 2024.

17.     Plaintiff Terrance Pruitt is now and has at all relevant times been a resident and citizen of Mississippi, currently residing in Southaven, Mississippi. Plaintiff Pruitt received the

letter notifying him of the breach, via email, directly from Defendant dated June 26, 2024.

18.    Plaintiff William Britton is now and has at all relevant times been a resident and citizen of California, currently residing in El Dorado County, California. Plaintiff Britton received the letter notifying him of the breach, via email, directly from Defendant dated July 12, 2024 and another on July 24, 2024.

19.    Plaintiff Trae Santiago is now and has at all relevant times been a resident and citizen of Texas, currently residing in Dallas County, Texas. Plaintiff Santiago received the letter notifying him of the breach, via email, from Defendant's partner/affiliate dated June 28, 2024.

20.    Plaintiff Jasmine Mack d/b/a J. Mack Enterprises and has at all relevant times been a resident and citizen of Louisiana, currently residing in New Orleans, Louisiana. Plaintiff Mack received the letter notifying her of the breach, via email, directly from Defendant dated June 26, 2024.

21.    Defendant is an Arkansas chartered bank and trust with a principal place of business at 301 Shoppingway Boulevard, West Memphis, Arkansas 72301. Defendant provides retail and commercial banking and mortgage services in several states. Evolve is also a major credit card issuer, is active in the fintech business sector and is a top 50 originator and receiver of ACH payments in 2023 according to Nacha.[2]

22.    Additionally, on June 11, 2024, the US Federal Reserve Board ordered Evolve to "cease and desist" after a 2023 audit noted deficiencies in its anti-money laundering, risk management, and consumer compliance programs.[3]

23.    The true names and capacities of persons or entities, whether individual,

---

[2] *See* https://www.nacha.org/news/nacha-unveils-top-50-ach-originating-and-receiving-financial-institutions-2023 (last visited June 28, 2024).
[3] *See* https://www.fintechfutures.com/2024/06/us-federal-reserve-board-issues-cease-and-desist-order-against-evolve-bank/ (last visited June 28, 2024).

corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiffs.  Plaintiffs will seek leave of court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

24.     All of Plaintiffs' claims stated herein are asserted against Defendant and any of its owners, predecessors, successors, subsidiaries, agents and/or assigns.

### III.  JURISDICTION AND VENUE

25.     This Court has subject matter and diversity jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount of controversy exceeds the sum or value of $5 million, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one Class Member is a citizen of a state different from Defendant to establish minimal diversity.

26.     Defendant is a citizen of Arkansas because it is a bank and trust formed under Arkansas law with its principal place of business in West Memphis, Arkansas.

27.     The District of Arkansas has personal jurisdiction over Defendant because it conducts substantial business in Arkansas and this District and collected and/or stored the PII of Plaintiff and Class Members in this District.

28.     Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant operates in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, including Defendant collecting and/or storing the PII of Plaintiffs and Class Members.

### IV.     FACTUAL ALLEGATIONS

*Background*

29.     Defendant collected the PII of Plaintiffs and Class Members and stored it,

6

unencrypted, on Defendant's internet-accessible network.

30.     Plaintiffs and Class Members relied on this sophisticated Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members demand security to safeguard their PII.

31.     Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiffs and Class Members from involuntary disclosure to third parties.

***The Data Breach***

32.     On or about June 26, 2024, Defendant sent Plaintiffs and Class Members an emailed *Notice of Data Breach* informing Plaintiffs and other Class Members that:

> Evolve Bank & Trust Evolve Bank & Trust is making retail bank customers and financial technology partners' customers (end users) aware of a cybersecurity incident that may involve certain personal information, as well as the actions we have taken in response, and additional steps individuals may take.
>
> **What Happened**
> Evolve is currently investigating a cybersecurity incident involving a known cybercriminal organization that appears to have illegally obtained and released on the dark web the data and personal information of some Evolve retail bank customers and financial technology partners' customers (end users). We take this matter extremely seriously and are working diligently to address the situation. Evolve has engaged the appropriate law enforcement authorities to aid in our investigation and response efforts. Based on what our investigation has found and what we know at this time, we are confident this incident has been contained and there is no ongoing threat.
>
> **What Information Was Involved**
> It appears these bad actors have released illegally obtained data, including Personal Identification Information (PII), on the dark web. The data varies by individual but may include your name, Social Security Number, date of birth, account information and/or other personal information.
>
> **What We Are Doing**
> We are beginning the long process of communicating with customers and financial technology partners' customers (end users) who have been affected by this incident. If you are an impacted retail bank customer, you will receive an email from

7

notifications@getevolved.com. If you are a financial technology partner, banking app customer (end user) you will receive an email directly from your provider. The email will include detailed instructions on how to enroll in complimentary credit monitoring with identity theft detection services.

Exhibit 1 (Notice of Data Breach posted at https://www.getevolved.com/about/news/cybersecurity-incident/).

33.     Defendant admitted in the *Notice of Data Breach* that an unauthorized actor accessed sensitive information about Plaintiffs and Class Members, including name and social security number.

34.     The details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure a breach does not occur again have not been shared with regulators or Plaintiffs and Class Members, who retain a vested interest in ensuring that their information remains protected.

35.     The unencrypted PII of Plaintiffs and Class Members may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the PII of Plaintiffs and Class Members.

36.     Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information it was maintaining for Plaintiffs and Class Members, causing the exposure of PII for Plaintiffs and Class Members.

37.     Because Defendant had a duty to protect Plaintiffs' and Class Members' PII, Defendant should have accessed readily available and accessible information about potential threats for the unauthorized exfiltration and misuse of such information.

38.     In the years immediately preceding the Data Breach, Defendant knew or should have known that Defendant's computer systems were a target for cybersecurity attacks because

warnings were readily available and accessible via the internet.

39.     In October 2019, the Federal Bureau of Investigation published online an article titled "High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations" that, among other things, warned that "[a]lthough state and local governments have been particularly visible targets for ransomware attacks, ransomware actors have also targeted health care organizations, industrial companies, and the transportation sector."[4]

40.     In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[5]

41.     The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's customers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

42.     Private Information is a valuable property right.[6] The value of Private Information as a commodity is measurable.[7] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing

---

[4] FBI, High-Impact Ransomware Attacks Threaten U.S. Businesses and Organizations (Oct. 2, 2019) (emphasis added), available at https://www.ic3.gov/Media/Y2019/PSA191002 (last visited Feb. 24, 2023).

[5] Facts + Statistics: Identity Theft and Cybercrime, INSURANCE INFORMATION INSTITUTE, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-andcybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20          (last visited Apr. 27, 2023).

[6] See Marc Van Lieshout, The Value of Personal Data, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[7] Robert Lowes, Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle/824192.

legal and regulatory frameworks."[8] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[9] It is so valuable to identity thieves that once Private Information has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for years afterwards.

43.    As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, Private Information, and other sensitive information directly on various internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

44.    In April 2020, ZDNet reported, in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year," that "*[r]ansomware gangs are now ferociously aggressive in their pursuit of big companies*. They breach networks, use specialized tools to maximize damage, *leak corporate information on dark web portals*, and even tip journalists to generate negative news for companies as revenge against those who refuse to pay."[10]

45.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that *"[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to*

---

[8] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-andtechnology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[9] U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience and Data-Use Solutions in 2018, Up 17.5% from 2017, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[10] ZDNet, Ransomware mentioned in 1,000+ SEC filings over the past year (Apr. 30, 2020) (emphasis added), available at https://www.zdnet.com/article/ransomware-_mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Feb. 24, 2023).

*release stolen data* if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[11]

46.     According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

47.     That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, and to take over victims' identities to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

---

[11] U.S. CISA, Ransomware Guide–September 2020, available at
https://www.cisa.gov/stopransomware/ransomware-guide (last visited April 21, 2023).

48.     Theft of PII is serious. The FTC warns consumers that identity thieves use PII to exhaust financial accounts, receive medical treatment, open new utility accounts, and incur charges and credit in a person's name.

49.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing freezes on their credit, and correcting their credit reports.

50.     Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

51.     Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

52.     Even if stolen PII does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of

identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

53.    Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[12]

54.    This readily available and accessible information confirms that, prior to the Data Breach, Defendant knew or should have known that (i) cybercriminals were targeting big companies such as Defendant, (ii) cybercriminals were ferociously aggressive in their pursuit of big companies such as Defendant, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

55.    In light of the information readily available and accessible on the internet before the Data Breach, Defendant, having elected to store the unencrypted PII of Plaintiffs and Class Members in an Internet-accessible environment, had reason to be on guard for the exfiltration of the PII and Defendant's type of business had cause to be particularly on guard against such an attack.

56.    Prior to the Data Breach, Defendant knew or should have known that there was a foreseeable risk that Plaintiffs' and Class Members' PII could be accessed, exfiltrated, and

_____

[12] Janice Y. Tsai et al., The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study, 22(2) INFORMATION SYSTEMS RESEARCH 254 (June 2011), https://www.guanotronic.com/~serge/papers/isr10.pdf.

published as the result of a cyberattack.

57.    Prior to the Data Breach, Defendant knew or should have known that it should have encrypted the Social Security numbers and other sensitive data elements within the PII to protect against their publication and misuse in the event of a cyberattack.

***Defendant Acquires, Collects, and Stores the PII of Plaintiff and Class Members.***

58.    Defendant acquired, collected, and stored the PII of Plaintiffs and Class Members.

59.    By obtaining, collecting, and storing the PII of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting the PII from disclosure.

60.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII and relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

61.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[13]

62.    To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the United States Government, the following measures:

   a.    Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

---

[13] See How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for- cisos.pdf/view (last visited Feb. 24, 2023).

b.      Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c.      Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d.      Configure firewalls to block access to known malicious IP addresses.

e.      Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f.      Set anti-virus and anti-malware programs to conduct regular scans automatically.

g.      Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h.      Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i.      Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

15

j.      Consider disabling Remote Desktop protocol (RDP) if it is not being used.

k.      Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

l.      Execute operating system environments or specific programs in a virtualized environment.

m.      Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[14]

63.     To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords

**Apply principle of least-privilege**

---

[14] *Id.* at 3-4.

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events

**Harden infrastructure**

- Use Windows Defender Firewall
- Enable tamper protection
- Enable cloud-delivered protection
- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[15]

64.     Given that Defendant was storing the PII of more than 4.8 million individuals, Defendant could and should have implemented all the above measures to prevent and detect ransomware attacks.

65.     The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the PII of more than 4.8 million individuals, including Plaintiffs and Class Members.

***Securing PII and Preventing Breaches***

66.     Defendant could have prevented this Data Breach by properly securing and encrypting the folders, files, and or data fields containing the PII of Plaintiffs and Class Members. Alternatively, Defendant could have destroyed the data it no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

---

[15] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), available at https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Feb. 24, 2023).

67.     Defendant's negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

68.     Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

69.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[16] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[17]

70.     The ramifications of Defendant's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

***Value of Personal Identifiable Information***

71.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[18] Experian reports that a stolen credit

---

[16] 17 C.F.R. § 248.201 (2013).
[17] *Id.*
[18] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct.

or debit card number can sell for $5 to $110 on the dark web.[19] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[20]

72.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

73.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[21]

74.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

75.    The fraudulent activity resulting from the Data Breach may not come to light for years.

76.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government

---

16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 24, 2023).

[19] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark- web/ (last visited Feb. 24, 2023).

[20] *In the Dark*, VPN Overview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Feb. 24, 2023.

[21] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit CardNumbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Feb. 24, 2023).

Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[22]

77.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

78.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Classes are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

79.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data contained in Defendant's contract search tool, amounting to potentially tens of thousands of individuals detailed, personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

80.    To date, Defendant has offered Plaintiffs and Class Members 12 months of complimentary credit monitoring and identify protection services through Single Bureau Credit Monitoring/Single Bureau Credit Report/Single Bureau Credit Score Services. The offered service is inadequate to protect Plaintiffs and Class Members from the threats they face for years to come, particularly in light of the PII at issue here.

---

[22] Report to Congressional Requesters, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Feb. 24, 2023).

81.     The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

***Plaintiffs' Experiences***

82.     Plaintiff Jackson maintained an account at Yotta which used services from Defendant or its affiliate prior to the data breach and received Defendant's Notice of Data Breach, dated June 26, 2024, on or about that date.

83.     Plaintiff Pruitt is a former customer of Defendant and used services from Defendant or its affiliate prior to the data breach and received Defendant's Notice of Data Breach, dated June 26, 2024, on or about that date.

84.     Plaintiff Mack is a customer of Wise and used services from Defendant or its affiliate prior to the data breach and received Defendant's Notice of Data Breach, dated June 26, 2024, on or about that date.

85.     Plaintiff Britton is a customer of Defendant and maintained a two bank accounts with Defendant, one checking account with a debit card and one savings account prior to the Data Breach. Plaintiff Britton received email notice(s) on July 12, 2024 and July 24, 2024 for each of his accounts with Defendant.

86.     Plaintiff Santiago is a user of the BILT Rewards payment platform that utilizes Defendant's and Defendant's partners to process rent payments prior to the Data Breach. Plaintiff Santiago received notice of the Data Breach dated June 28, 2024.

87.     As a result of the Data Breach, Plaintiffs' sensitive information was accessed and/or acquired by an unauthorized actor. The confidentiality of Plaintiffs' sensitive information has been irreparably harmed. For the rest of their lives, Plaintiffs will have to worry about when

21

and how their sensitive information may be shared or used to their detriment.

88.     As a result of the Data Breach notice, Plaintiffs spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the *Notice of Data Breach* and self-monitoring their accounts. This time has been lost forever and cannot be recaptured.

89.     Additionally, Plaintiffs are very careful about sharing their sensitive PII. They have never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source.

90.     Plaintiffs store any documents containing their sensitive PII in a safe and secure location or destroys the documents. Moreover, they diligently chooses unique usernames and passwords for their various online accounts.

91.     Defendant's data security shortcomings resulted in the Data Breach and caused Plaintiffs significant injuries and harm in several ways. For example, Plaintiffs have devoted and will continue to devote significant time, energy, and money to: closely monitoring their bills, records, and credit and financial accounts; changing login and password information on any sensitive account; carefully screening and scrutinizing phone calls, emails, and other communications to ensure that they are not being targeted by identity theft scams, medical identity theft scams, or other attempts at fraud; searching for suitable identity theft protection and credit monitoring services and paying for such services to protect themselves; and placing fraud alerts and/or credit freezes on their credit file. Plaintiffs have taken or will be forced to take these measures to mitigate their potential damages because of the Data Breach.

92.     Plaintiffs have suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from their PII, especially

their Social Security number, being placed in the hands of unauthorized third parties and possibly criminals.

93.     Plaintiffs have a continuing interest in ensuring that their PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## V.     CLASS ACTION ALLEGATIONS

94.     Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure and Local Rule 23.1.

95.     The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All persons in the United States and its territories whose PII was compromised in the Data Breach, including all individuals who received a data breach notification letter from Defendant. (the "Nationwide Class").

96.     Pursuant to Rule 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate subclass, defined as follows:

> All individuals who maintained personal banking accounts or obtained loans or other services from Defendant on or before June 23, 2024, and whose PII was accessed and/or acquired in the data incident that is the subject of the Notice of Data Breach that Defendant sent to Plaintiff and Class Members on or around June 26, 2024 (the "Customers Subclass") (collectively, with the Nationwide Class "the Classes").

97.     Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this

litigation, as well as their immediate family members.

98.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

99.    Numerosity, Fed R. Civ. P. 23(a)(1): The Classes are so numerous that joinder of all members is impracticable. Defendant reported that more than 33 terabytes of customer account information and transactions[23] was impacted in the Data Breach, and the Classes are apparently identifiable within Defendant's records.

100.    Commonality, Fed. R. Civ. P. 23(a)(2) and (b)(3): Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include *inter alia*:

a.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class Members' Private Information from unauthorized access and disclosure;

b.    Whether Defendant's actions and its allegedly lax data security practices used to protect Plaintiffs' and Class Members' PII violated the FTC Act and/or other state laws and/or Defendant's other duties alleged herein;

c.    Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and Class Members;

d.    Whether Plaintiffs and Class Members suffered injury as a proximate result of Defendant's negligent actions or failures to act;

---

[23] *See* https://www.securityweek.com/evolve-bank-data-leaked-after-lockbits-federal-reserve-hack/ (last visited June 28, 2024).

e.   Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class Members' PII;

f.   Whether an implied contract existed between Class Members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Class Members' PII from unauthorized access and disclosure;

g.   Whether an express contract existed between class members and Defendant providing that Defendant would implement and maintain reasonable security measures to protect and secure Class Members' PII from unauthorized access and disclosure;

h.   Whether Plaintiffs and Class Members are intended third party beneficiaries of contracts between Defendant and third parties, and if so whether Defendant breached those contracts;

i.   Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiffs and Class Members;

j.   Whether Defendant's actions and inactions alleged herein constitute gross negligence;

k.   Whether Defendant breached its duties to protect Plaintiffs and Class Members' Private Information; and

l.   Whether Plaintiffs and all other members of the Class are entitled to damages and the measure of such damages and relief.

101.   Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other Class Members. Individual

questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

102.    Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised as a result of the Data Breach, due to Defendant's misfeasance.

103.    Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiffs challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

104.    Adequacy, Fed. R. Civ. P. 23(a)(4): Plaintiffs will fairly and adequately represent and protect the interests of Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Classes. Plaintiffs received the notification of the data breach and have experienced actual damages as a result of the breach. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Classes and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have retained counsel experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.

105.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3): Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy

alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

106.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

107.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

108.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

109.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to class members' names and addresses affected by the Data Breach. Indeed, class members have already been preliminarily identified and sent notice of the Data Breach.

110.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

111.    Further, Defendant has acted or refused to act on grounds generally applicable to the Classes and, accordingly, final injunctive or corresponding declaratory relief with regard to Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

112.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.    Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

      b.    Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their PII;

      c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

      d.    Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

28

e.      Whether Defendant breached the implied contract;

f.      Whether Defendant adequately and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.      Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

h.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII of Plaintiffs and Class Members; and,

i.      Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiff and the Classes)

113.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

114.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Classes could and would suffer if the PII were wrongfully disclosed.

115.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Classes involved an unreasonable risk of harm to Plaintiffs and the Classes, even if the harm occurred through the criminal acts of a third party.

116.    Defendant had a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties. This duty includes, among other things, designing, maintaining, and testing

29

Defendant's security protocols to ensure that the PII of Plaintiffs and the Classes in Defendant's possession was adequately secured and protected.

117.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove from an Internet-accessible environment the PII it was no longer required to retain pursuant to regulations and had no reasonable need to maintain in an Internet-accessible environment.

118.    Defendant also had a duty to have procedures in place to detect and prevent the improper access and misuse of the PII of Plaintiffs and the Classes.

119.    Defendant's duty to use reasonable security measures arose as a result of the special relationship that existed between Defendant and Plaintiffs and the Classes. That special relationship arose because Defendant acquired Plaintiffs and the Classes' confidential PII in the course of its business practices.

120.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Classes.

121.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Classes was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

122.    Plaintiffs and the Classes were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiffs and the Classes, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems.

123.    Defendant's own conduct created a foreseeable risk of harm to Plaintiffs and the Classes. Defendant's misconduct included, but was not limited to, its failure to take the steps and

opportunities to prevent the Data Breach as set forth herein. Defendant's misconduct also included its decisions not to comply with industry standards for the safekeeping of the PII of Plaintiffs and the Classes, including basic encryption techniques freely available to Defendant.

124.    Plaintiffs and the Classes had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

125.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Classes as a result of the Data Breach.

126.    Defendant had and continue to have a duty to adequately disclose that the PII of Plaintiffs and the Classes within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Classes to (i) take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties and (ii) prepare for the sharing and detrimental use of their sensitive information.

127.    Defendant had a duty to employ proper procedures to prevent the unauthorized dissemination of the PII of Plaintiffs and the Classes.

128.    Defendant has admitted that the PII of Plaintiffs and the Classes were wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

129.    Defendant, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and the Classes by failing to implement industry protocols and exercise reasonable care in protecting and safeguarding the PII of Plaintiffs and the Classes during the time the PII was within Defendant's possession or control.

130.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Classes in deviation of standard industry rules, regulations, and practices at the time of the Data

Breach.

131.     Defendant failed to heed industry warnings and alerts to provide adequate safeguards to protect the PII of Plaintiffs and the Classes in the face of increased risk of theft.

132.     Defendant, through its actions and/or omissions, unlawfully breached its duty to Plaintiffs and the Classes by failing to have appropriate procedures in place to detect and prevent dissemination of the PII.

133.     Defendant breached its duty to exercise appropriate clearinghouse practices by failing to remove from the Internet-accessible environment any PII it was no longer required to retain pursuant to regulations and which Defendant had no reasonable need to maintain in an Internet-accessible environment.

134.     Defendant, through its actions and/or omissions, unlawfully breached its duty to adequately and timely disclose to Plaintiffs and the Classes the existence and scope of the Data Breach.

135.     But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Classes, the PII of Plaintiffs and the Classes would not have been compromised.

136.     There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiffs and the Classes and the harm, or risk of imminent harm, suffered by Plaintiffs and the Classes. The PII of Plaintiffs and the Classes were lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

137.     As a direct and proximate result of Defendant's negligence, Plaintiffs and the Classes have suffered and will suffer injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity of how their PII is used; (iii) the compromise, publication, and/or

theft of their PII; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the continued risk to their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII of Plaintiffs and the  Classes; and (viii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiffs and the Classes.

138.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Classes have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

139.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Classes have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

140.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Classes are entitled to recover actual, consequential, and nominal damage.

## COUNT II
## BREACH OF FIDUCIARY DUTY
### (On behalf of Plaintiffs and the Classes)

141.     Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

142.     Plaintiffs bring this claim individually and on behalf of the Classes.

143.     Plaintiffs and Class Members have an interest, both equitable and legal, in their PII that was conveyed to, collected by, and maintained by Defendant and that was accessed or compromised in the Data Breach.

144.     As a recipient of customers' PII, Defendant has a fiduciary relationship to its customers, including Plaintiffs and the Class Members.

145.     Because of that fiduciary relationship, Defendant was provided with and stored private and valuable PII related to Plaintiffs and the Classes. Plaintiffs and Class Members were entitled to expect their information would remain confidential while in Defendant's possession.

146.     Defendant owed a fiduciary duty under common law to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

147.     As a result of the parties' fiduciary relationship, Defendant had an obligation to maintain the confidentiality of the information within Plaintiffs' and Class Members' financial records.

148.     As a result of the parties' relationship, Defendant had possession and knowledge of confidential PII of Plaintiffs and Class Members, information not generally known.

149.     Plaintiffs and Class Members did not consent to nor authorize Defendant to release

or disclose their PII to unknown criminal actors.

150.    Defendant breached its fiduciary duties owed to Plaintiffs and Class Members by, among other things:

a.    mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

b.    mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

c.    failing to design and implement information safeguards to control these risks;

d.    failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.    failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.    failing to detect the breach at the time it began or within a reasonable time thereafter;

g.    failing to follow its own privacy policies and practices published to its patients; and

h.    failing to adequately train and supervise employees and third-party vendors with access or credentials to systems and databases containing sensitive PII.

151.    But for Defendant's wrongful breach of its fiduciary duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

152.    As a direct and proximate result of Defendant's breach of its fiduciary duties,

Plaintiffs and Class Members have suffered injuries, including:

     a.     Theft of their PII; Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

     b.     Costs associated with purchasing credit monitoring and identity theft protection services; Lowered credit scores resulting from credit inquiries following fraudulent activities;

     c.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

     d.     The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

     e.     Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

     f.     Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

g.    and Emotional distress from the unauthorized disclosure of Private Information to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

153.    As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## COUNT III
## BREACH OF CONFIDENCE
### (On behalf of Plaintiffs and the Classes)

154.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

155.    Plaintiffs bring this claim individually and on behalf of the Classes.

156.    Plaintiffs and Class Members have an interest, both equitable and legal, in their PII that was conveyed to, collected by, and maintained by Defendant and that was accessed or compromised in the Data Breach.

157.    Defendant was provided with and stored private and valuable PII related to Plaintiffs and the Classes, which it was required to maintain in confidence.

158.    Plaintiffs and the Classes provided Defendant with their personal and confidential PII under both the express and/or implied agreement of Defendant to limit the use and disclosure of such PII.

159.    Defendant owed a duty to Plaintiffs and Class Members to exercise the utmost care in obtaining, retaining, securing, safeguarding, deleting, and protecting their PII in its possession from being compromised, lost, stolen, accessed by, misused by, or disclosed to

unauthorized persons.

160.     Defendant had an obligation to maintain the confidentiality of Plaintiffs' and Class Members' PII.

161.     Plaintiffs and Class Members have a privacy interest in their personal financial matters, and Defendant had a duty not to disclose confidential medical information and records concerning its customers.

162.     As a result of the parties' relationship, Defendant had possession and knowledge of confidential PII and confidential financial records of Plaintiffs and Class Members.

163.     Plaintiffs' and Class Members' PII is not generally known to the public and is confidential by nature.

164.     Plaintiffs and Class Members did not consent to nor authorize Defendant to release or disclose their PII to unknown criminal actors.

165.     Defendant breached the duties of confidence it owed to Plaintiffs and Class Members when Plaintiffs' and Class Members' PII was disclosed to unknown criminal hackers.

166.     Defendant breached its duties of confidence by failing to safeguard Plaintiffs' and Class Members' PII, including by, among other things:

   a.     mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII;

   b.     mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks;

   c.     failing to design and implement information safeguards to control these risks;

d.      failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures;

e.      failing to evaluate and adjust its information security program in light of the circumstances alleged herein;

f.      failing to detect the breach at the time it began or within a reasonable time thereafter;

g.      failing to follow its on privacy policies and practices published to its customers;

h.      storing PII in an unencrypted and vulnerable manner, allowing its disclosure to hackers; and

i.      making an unauthorized and unjustified disclosure and release of Plaintiffs and the Class Members' PII to a criminal third party.

167.    But for Defendant's wrongful breach of its duty of confidences owed to Plaintiffs and Class Members, their privacy, confidences, and PII would not have been compromised.

168.    As a direct and proximate result of Defendant's breach of Plaintiffs' and Class Members' confidences, Plaintiffs and Class Members have suffered injuries, including:

a.      Loss of their privacy and confidentiality in their PII;

b.      Theft of their private information;

c.      Costs associated with the detection and prevention of identity theft and unauthorized use of their private information;

d.      Costs associated with purchasing credit monitoring and identity theft protection services;

e.      Lowered credit scores resulting from credit inquiries following fraudulent

activities;

      f.      Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Evolve Bank & Trust Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

      g.      The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their private information being placed in the hands of criminals;

      h.      Damages to and diminution in value of their private information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

      i.      Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

      j.      Mental anguish accompanying the loss of confidences and disclosure of their confidential and private PII.

169.      Additionally, Defendant received payments from Plaintiffs and Class Members for services with the understanding that Defendant would uphold its responsibilities to maintain the confidences of Plaintiffs' and Class Members' PII.

170.     Defendant breached the confidence of Plaintiffs and Class Members when it made an unauthorized release and disclosure of their confidential information and PII and, accordingly, it would be inequitable for Defendant to retain the benefit at Plaintiffs' and Class Members' expense.

171.     As a direct and proximate result of Defendant's breach of its duty of confidences, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

## COUNT IV
## INTRUSION UPON SECLUSION/INVASION OF PRIVACY
### (On behalf of Plaintiffs and the Classes)

172.     Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

173.     Plaintiffs bring this claim individually and on behalf of the Classes.

174.     Plaintiffs and Class Members had a reasonable expectation of privacy in the PII Defendant mishandled.

175.     Defendant's conduct as alleged above intruded upon Plaintiffs' and Class Members' seclusion under common law.

176.     By intentionally failing to keep Plaintiffs' and Class Members' PII safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' privacy by:

a.     Intentionally and substantially intruding into Plaintiffs' and Class Members' private affairs in a manner that identifies Plaintiffs and Class Members and that would be highly offensive and objectionable to an ordinary person;

b.     Intentionally publicizing private facts about Plaintiffs and Class Members, which

41

is highly offensive and objectionable to an ordinary person; and,

        c.       Intentionally causing anguish or suffering to Plaintiffs and Class Members.

      177.     Defendant knew that an ordinary person in Plaintiffs' or Class Members' position would consider Defendant's intentional actions highly offensive and objectionable.

      178.     Defendant invaded Plaintiffs' and Class Members' right to privacy and intruded into Plaintiffs' and Class Members' private affairs by intentionally misusing and/or disclosing their PII without their informed, voluntary, affirmative, and clear consent.

      179.     Defendant intentionally concealed from and delayed reporting to Plaintiffs and Class Members a security incident that misused and/or disclosed their PII without their informed, voluntary, affirmative, and clear consent.

      180.     The conduct described above was at or directed at Plaintiffs and Class Members.

      181.     As a proximate result of such intentional misuse and disclosures, Plaintiffs' and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiffs' and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

      182.     In failing to protect Plaintiffs' and Class Members' PII, and in intentionally misusing and/or disclosing their PII, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and Class Members' rights to have such information kept confidential and private. Plaintiffs, therefore, seeks an award of damages on behalf of themselves and the Classes.

      183.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class

Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

**COUNT V**
**BREACH OF IMPLIED CONTRACT**
**(On behalf of Plaintiffs and the Classes)**

184.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein. This claim is pled in the alternative to the breach of express contract claim and all the other claims herein.

185.    Plaintiffs bring this claim individually and on behalf of the Classes.

186.    When Plaintiffs and Class Members provided their PII to Defendant, they entered into implied contracts with Defendant, under which Defendant agreed to take reasonable steps to protect Plaintiffs' and Class Members' PII, comply with it statutory and common law duties to protect Plaintiffs' and Class Members' PII, and to timely notify them in the event of a data breach.

187.    Defendant solicited and invited Plaintiffs and Class Members to provide their PII as part of Defendant's provision of financial services. Plaintiffs and Class Members accepted Defendant's offers and provided their PII to Defendant.

188.    When entering into implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendant's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class Members' PII and to timely notify them in the event of a data breach.

189.    Plaintiffs and Class Members paid money to Defendant to receive financial services. Plaintiffs and Class Members reasonably believed and expected that Defendant would use part of those funds to obtain adequate data security. Defendant failed to do so.

190.    Plaintiffs and Class Members would not have provided their PII to Defendant had

they known that Defendant would not safeguard their PII, as promised, or provide timely notice of a data breach.

191.     Plaintiffs and Class Members fully performed their obligations under their implied contracts with Defendant.

192.     Defendant breached its implied contracts with Plaintiffs and Class Members by failing to safeguard Plaintiffs' and Class Members' PII and by failing to provide them with timely and accurate notice of the Data Breach.

193.     The losses and damages Plaintiffs and Class Members sustained, include, but are not limited to:

        a.     Theft of their PII;

        b.     Costs associated with purchasing credit monitoring and identity theft protection services;

        c.     Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

        d.     Lowered credit scores resulting from credit inquiries following fraudulent activities;

        e.     Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

        f.     The imminent and certainly impending injury flowing from the increased

risk of potential fraud and identity theft posed by their PII being placed in the hands of criminals;

     g.     Damages to and diminution in value of their PII entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

     h.     Continued risk of exposure to hackers and thieves of their PII, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data; and

     i.     Emotional distress from the unauthorized disclosure of PII to strangers who likely have nefarious intentions and now have prime opportunities to commit identity theft, fraud, and other types of attacks on Plaintiffs and Class Members.

194.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

## <u>COUNT VI</u>
## BREACH OF EXPRESS CONTRACT
### (On behalf of Plaintiffs and the Classes)

195.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein. This claim is pleaded in the alternative to the breach of implied contract claim and all the other claims herein.

196.    Plaintiffs bring this claim individually and on behalf of the Classes.

197.    Defendant's privacy policy created an express contractual obligation to safeguard

and protect the sensitive information of Plaintiffs and Class Members.

198.    Defendant breached this contractual duty by failing to adequately safeguard Plaintiffs' and Class Members' PII, and by allowing it to be disseminated to unauthorized third parties.

199.    Plaintiffs and Class Members substantially performed their part of the bargain.

200.    Defendant's breach of this contractual obligation in the privacy policy and elsewhere caused damages to Plaintiffs and Class Members, as set forth herein.

**COUNT VII**
**UNJUST ENRICHMENT**
**(On behalf of Plaintiff sand the Classes)**

201.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

202.    Plaintiffs bring this claim individually and on behalf of the Classes in the alternative to Plaintiffs' contractual based claims pursuant to Fed. R. Civ. P. 8.

203.    Upon information and belief, Defendant funds its data security measures utilizing payments made by or on behalf of Plaintiffs and the Class Members.

204.    As such, a portion of the payments made by or on behalf of Plaintiffs and the Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

205.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased financial services from Evolve and/or its agents and in so doing provided Defendant with their PII. In exchange, Plaintiffs and Class Members should have received from Defendant the goods and services that were the subject of the transaction and had their PII protected with adequate data security.

206.     Defendant knew that Plaintiffs and Class Members conferred a benefit which Defendant accepted. Defendant profited from these transactions and used the PII of Plaintiffs and Class Members for business purposes.

207.     In particular, Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead elected to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the requisite security.

208.     Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by its common law and statutory duties.

209.     Defendant failed to secure Plaintiffs and Class Members' PII and, therefore, did not provide full compensation for the benefit Plaintiffs and Class Members provided.

210.     Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

211.     If Plaintiffs and Class Members knew that Defendant had not reasonably secured their PII, they would not have agreed to provide their PII to Defendant.

212.     Plaintiffs and Class Members have no adequate remedy at law.

213.     As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

214.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that it unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT X**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Classes)**

215.    Plaintiffs and the Classes reallege and incorporate by reference herein all the preceding allegations above as if fully alleged herein.

216.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Further, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

217.    An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and the Classes' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and the Classes from further data breaches that compromise their PII. Plaintiffs alleges that Defendant's data security measures remain inadequate. Defendant publicly denies these allegations. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future. It is unknown what specific measures and changes Defendant has undertaken in response to the Data Breach.

218.    Plaintiffs and the Classes have an ongoing, actionable dispute arising out of Defendant's inadequate security measures, including (i) Defendant's failure to encrypt Plaintiffs' and the Classes' PII, including Social Security numbers, while storing it in an Internet-accessible

48

environment and (ii) Defendant's failure to delete PII it has no reasonable need to maintain in an Internet- accessible environment, including the Social Security number of Plaintiffs.

219.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a.   Defendant owes a legal duty to secure the PII of Plaintiffs and the Classes;

b.   Defendant continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII; and

c.   Defendant's ongoing breaches of its legal duty continue to cause Plaintiffs' harm.

220.    This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry and government regulatory standards to protect consumers' PII. Specifically, this injunction should, among other things, direct Defendant to:

a.   engage third party auditors, consistent with industry standards, to test its systems for weakness and upgrade any such weakness found;

b.   audit, test, and train its data security personnel regarding any new or modified procedures and how to respond to a data breach;

c.   regularly test its systems for security vulnerabilities, consistent with industry standards;

d.   implement an education and training program for appropriate employees regarding cybersecurity.

221.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Defendant. The risk of another such

breach is real, immediate, and substantial. If another breach at Defendant occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

222.    The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

223.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Defendant, thus eliminating the additional injuries that would result to Plaintiffs and others whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grant the following:

A.    For an Order certifying the Nationwide Class and the Customer Subclass and appointing Plaintiffs and their Counsel to represent such Classes;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiffs and Class Members, and from refusing to issue prompt, complete, any accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members,

including but not limited to an order:

        i.     prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

        ii.     requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

        iii.     requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

        iv.     requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

        v.     prohibiting Defendant from maintaining the PII of Plaintiffs and Class Members on a cloud-based database;

        vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

        vii.     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

ix.    requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

x.    requiring Defendant to conduct regular database scanning and securing checks;

xi.    requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xii.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiv.    requiring Defendant to implement, maintain, regularly review, and

revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xvi.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the Classes, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of damages, including actual, consequential, and nominal damages, as allowed by law in an amount to be determined;

E.    For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.    For prejudgment interest on all amounts awarded; and

G.    Such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs hereby demand that this matter be tried before a jury.

Dated: July 29, 2024                         Respectfully submitted,

Joseph Henry (Hank) Bates, III (ABN 98063)
Randall K. Pulliam (ABN 98105)
**CARNEY BATES & PULLIAM, PLLC**
One Allied Drive, Suite 1400
Little Rock, Arkansas 72202
Tel: (501) 312-8500
Email: hbates@cbplaw.com
Email: rpulliam@cbplaw.com

Marc H. Edelson
Liberato P. Verderame
(*pro hac vice* anticipated)
**EDELSON LECHTZIN LLP**
411 S. State Street, Suite N-300
Newtown, PA 18940
Tel: (215) 867-2399
Fax: (267) 685-0676
Email: medelson@edelson-law.com
        lverderame@edelson-law.com

Leigh S. Montgomery (Texas Bar No. 24052214)
(*pro hac vice* forthcoming)
**EKSM, LLP**
1105 Milford Street
Houston, Texas 77006
Tel: (888) 350-3931
Fax: (888) 276-3455
Email: leigh@ellzeylaw.com

*Counsel for Plaintiffs and the Proposed Class*

# EXHIBIT 1



Home **»** About **»** News **»** **Cybersecurity Incident**



# Cybersecurity Incident

———————

**Posted: July 9, 2024**

Evolve began individual notifications on July 8, 2024. These notifications include an offer of two years of comprehensive credit monitoring and identity protection services for U.S. residents, while international residents will be offered dark web monitoring services where available. Additionally, the notices provide detailed information on these services, along with instructions for registration and contact details for our dedicated call center, established to assist with enrollment and address any inquiries related to the incident.

Our initial round of notifications is expected to be completed over the coming weeks. As previously mentioned, our investigation is ongoing, and we anticipate subsequent, smaller rounds of notifications.

We appreciate your ongoing patience throughout this process and regret any inconvenience caused by this incident.

**Posted: July 1, 2024**

The Evolve Team continues to work around the clock to respond to the recent cybersecurity incident. We are committed to transparency and have provided a detailed update below about what happened, how we are responding, and actions you can take. We will continue to provide regular updates on this page.

Thank you for your continued patience. We regret any inconvenience this incident may cause and are grateful for your understanding.

Because the investigation continues and information is being regularly updated and to avoid confusion, we have removed and archived previous updates.

# What Happened

In late May 2024, Evolve Bank & Trust identified that some of its systems were not working properly. While it initially appeared to be a hardware failure, we subsequently learned it was unauthorized activity. We engaged cybersecurity specialists to investigate and determined that unauthorized activity may have been the cause. We promptly initiated our incident response processes and stopped the attack. The Bank has seen no new unauthorized activity since May 31, 2024. We engaged outside specialists to investigate what happened and what data was affected, as well as a firm to help us restore our services. We reported this incident to law enforcement.

While the investigation is ongoing, we want to share some important information about what we know so far. At this time, current evidence shows the following:

- This was a ransomware attack by the criminal organization, LockBit.

- They appear to have gained access to our systems when an employee inadvertently clicked on a malicious internet link.

- There is no evidence that the criminals accessed any customer funds, but it appears they did access and download customer information from our databases and a file share during periods in February and May.

- The threat actor also encrypted some data within our environment. However, we have backups available and experienced limited data loss and impact on our operations.

- We refused to pay the ransom demanded by the threat actor. As a result, they leaked the data they downloaded. They also mistakenly attributed the source of the data to the Federal Reserve Bank.

# What We Have Done

Since becoming aware of the incident, we have taken steps to enhance existing controls and further secure our environment, including:

- Resetting passwords globally.

- Reconstructing critical Identity Access Management components, including Active Directory.

- Further hardening of firewall and dynamic security appliances.

- Deploying endpoint detection and response and other security tools to harden the network.

We are in the process of further strengthening our security response protocols, policies and procedures, and our ability to detect and respond to suspected incidents.

## What Information is Affected

At this time, we have evidence that files were downloaded from our systems. The investigation is in its early stages, but it appears that names, Social Security numbers, bank account numbers, and contact information were affected for most of our personal banking customers, as well as customers of our Open Banking partners. We have now learned that personal information relating to our employees was also likely impacted.

We are still investigating what other personal information was affected, including information regarding our Business, Trust, and Mortgage customers.

## What We Will Be Doing

We are committed to supporting our customers and partners through this process. To that end, we will be directly notifying each individual whose personal information was affected and offering them two years of free credit monitoring and identity theft protection. We anticipate that we will begin sending these individual notifications **via email** on July 8, 2024. These notices will also include details regarding our dedicated call center, established to provide assistance enrolling in credit monitoring and answer questions about the incident.

More details will be shared on this page in the coming days.

# What You Can Do

We encourage all personal banking customers and financial technology partners' customers (end users) to remain vigilant by monitoring account activity and credit reports.

You can set up free fraud alerts with nationwide credit bureaus—Equifax, Experian, and TransUnion. You can also request and review your free credit report at Freecreditreport.com. If you suspect any fraud or suspicious activity, please contact us immediately.

If you suspect that you are the victim of identity theft or fraud, you have the right to file a report with the Federal Trade Commission (FTC) or law enforcement authorities.

You can contact the FTC at:

Federal Trade Commission

600 Pennsylvania Avenue, NW

Washington, DC 20580

(877) ID-THEFT (438-4338)

https://www.identitytheft.gov

We appreciate your patience and understanding as we navigate this challenging situation. Your trust is of utmost importance to us, and we are committed to transparency.

If you have further questions, please review our Frequently Asked Questions page or contact cyberalert@getevolved.com or 833.947.1379.